IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FIRAS M. AYOUBI,**<br><br>　　　　**Plaintiff,**<br><br>v.<br><br>**WEXFORD HEALTH SOURCES, INC.,** *et al.*,<br><br>　　　　**Defendants.** | Case No. 18-cv-01689-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Pending before this Court is a motion for summary judgement filed by Defendants Wexford Health Sources, Inc., Butalid, Myers, Ritz, and Dearmond. (Doc. 233). Now that this matter has been fully briefed, and for the reasons set forth below, the Court grants the motion for summary judgment.

### BACKGROUND

Plaintiff Firas Ayoubi, an inmate in the Illinois Department of Corrections ("IDOC"), filed this action pro se under 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred while incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). (Doc. 1). Plaintiff asserts that prior to his incarceration at Pinckneyville, he began experiencing neurological symptoms, including involuntary twitching in his right shoulder and head. (Doc. 241, p. 1). After, his transfer to Pinckneyville, the symptoms progressed to include twisting of his torso and the jerking of his neck and right arm and shoulder. (Doc. 234-1, p. 9-10). The involuntary movements cause him pain and discomfort. He asserts that the Defendants failed to treat his neurological symptoms and associated pain, delayed treatment, and refused to renew his bottom bunk permit.

(Doc. 4, p. 4). Currently, Plaintiff is proceeding on the following claim:

> **Count 1:** Eighth Amendment claim against Wexford, Butalid, Myers, Ritz, and Dearmond for exhibiting deliberate indifference to Plaintiff's serious medical needs (worsening neurological symptoms associated with pain).[1]

Along with the Complaint, Plaintiff filed a motion for a temporary restraining order and preliminary injunction asking the Court to order that he be treated by an outside specialist and placed in specialized housing until he was treated by a neurologist. (Doc. 2). Initially, the Court denied the request for a temporary restraining order but deferred ruling on the request for a preliminary injunction. (Doc. 4, p. 6). A hearing was held before Magistrate Judge Sison, and he heard the testimony of Plaintiff, Dr. Butalid, Dr. Myers, and Dr. Ritz. Judge Sison recommended that the Court deny the request for a preliminary injunction. (Doc. 99). The Report and Recommendation was adopted by the Court, and the motion for a preliminary injunction denied. (Doc. 108). Plaintiff appealed, and the Seventh Circuit Court of Appeals affirmed this Court's decision. *See Ayoubi v. Wexford Health Sources, Inc.,* 819 F. App'x 439 (7th Cir. Sept. 3, 2020).

On August 12, 2020, due to the challenging nature of discovery in this case, the Court granted Plaintiff's motion for recruitment of counsel. (Doc. 198). Attorney David Renovitch was assigned to represent Plaintiff in this matter. (Doc. 203). After the motion for summary judgment was filed and Attorney Renovitch had submitted a response in opposition on Plaintiff's behalf, Plaintiff filed a motion asking the Court to allow his attorney to withdraw as counsel. (Doc. 236). Plaintiff found the response in opposition drafted by Attorney Renovitch to be "inadequate." The Court granted Plaintiff's motion. (Doc. 249). Plaintiff, who is now proceeding pro se, was allowed to supplement the response in opposition filed by Attorney Renovitch. (*See* Doc. 251).

---

[1] Plaintiff settled with Defendants Brown and Thompson after the close of discovery. (Doc. 232).

**RELEVANT FACTS**

Plaintiff began experiencing involuntary movements while in custody at the Cook County Jail and saw at least five different medical providers for his symptoms. (Doc. 251, p. 18; Doc. 341-1, p. 18; Doc. 324-7, p. 16, 38, 42, 46, 52, 56). According to an entry in his medical records dated July 14, 2017, Plaintiff was confirmed for an appointment at a neurology clinic on August 10, 2017. (Doc. 234-7, p. 96). On August 22, 2022, the medical records indicate that Plaintiff had a medical appointment in which he asked about his neurological evaluation. (Doc. 234-7, p. 46). The physician assistant informed Plaintiff that he was first going to be referred to physical medicine and rehabilitation for evaluation "prior to considering other diagnostics." (*Id.* at p. 49).

On September 5, 2017, Plaintiff was seen at "Rehab Medicine Outpatient" by Dr. McCarthy. (Doc. 234-1, p. 16). In Plaintiff's medical records, Dr. McCarthy notes under diagnosis "disorder of motor nervous system." (*Id.* at p. 18). She recorded that she "did not see nor could [she] reproduce any right shoulder or right chest wall abnormalities. He states that it is almost like a 'twitch' or spasm but did not see any evidence of either." Dr. McCarthy recommended that Plaintiff be monitored. (*Id.*). Plaintiff testified that from what he could recall, he believed there was a neurology referral following this appointment with Dr. McCarthy. (Doc. 234-1, p. 17).

Following his criminal conviction and sentencing, Plaintiff was transferred to Stateville Northern Receiving Center in December 2017, and then to Pinckneyville on January 11, 2018. (Doc. 234-1, p. 21, 23). On January 30, 2018, Plaintiff saw a nurse complaining of pain from involuntary movements. (*Id.* at p. 24; Doc. 234-6, p. 26). The nurse referred Plaintiff to a medical doctor. On January 31, 2018, Plaintiff saw Nurse Practitioner Bobby Blum. (Doc. 324-1, p. 24; Doc. 234-6, p. 36). Blum examined him and ordered lab tests. The tests included, a comprehensive metabolic panel, thyroid-stimulating hormone, complete blood count, erythrocyte sedimentation rate, magnesium blood level, vitamin B-12 level, and urinalysis culture and sensitivity.

On February 26, 2018, Plaintiff had a follow-up appointment with Blum. (Doc. 234-1, p. 24; Doc. 234-6, p. 38-39). The test results revealed that his B12, potassium, and albumin levels were low. (Doc. 234-1, p. 25). Blum's assessment was electrolyte abnormalities and Euthyroid Sick Syndrome. Blum's plan was to treat Plaintiff with cyanocobalamin (B12) injections, folic acid, and potassium. (Doc. 234-8, p. 62). Blum issued Plaintiff a low bunk/low gallery permit for February 28, 2018, through May 28, 2018. (Doc. 234-7, p. 86).

On April 22, 2018, Plaintiff had an appointment with Dr. Myers. (Doc. 234-1, p. 26; Doc. 234-6, p. 41). Plaintiff explained to Dr. Myers that approximately two years ago, he began experiencing involuntary shoulder movement and that the movement had "progressed now to the point that he has counterclockwise trunk movement and right arm movement." (*Id.*). Plaintiff stated he cannot "sit motionless [and] is in constant movement." (*Id.*). Dr. Myers' assessment was a form of chorea, and his plan was to refer Plaintiff for a neurology consult. During his deposition, Dr. Myers described chorea as "as hyperkinetic type movement that is involuntary" rooted in a neurological condition. (Doc. 234-3, p. 8). At the appointment, Dr. Myers discontinued the B12 injections, folic acid, and potassium because even though Plaintiff's levels were normal, he continued to complain of involuntary movements. (Doc. 234-1, p. 26; Doc. 234-6, p. 41). Dr. Myers completed an urgent referral request for a neurology consultation. In the request, Dr. Myers documented that Plaintiff has involuntary movement that has progressed and is "continuous and associated with pain." (Doc. 234-6, p. 108). Dr. Butalid, the medical director at Pinckneyville, approved the urgent referral request for Collegial Review. (Doc. 234-6, p. 108). Collegial Review is a process where the onsite medical director and the utilization medical director confer to determine the medical necessity and clinical appropriateness of offsite services. (Doc. 234, p. 4).

On April 23, 2018, Dr. Ritz, the utilization management medical director, reviewed the referral request and determined that the request should be discussed at the regularly scheduled

weekly Collegial Review call because the nature of the request was non-urgent. (Doc. 234-5, p. 10; Doc. 234-6, p. 107).

On April 26, 2018, Dr. Butalid and Dr. Ritz conferred in a Collegial Review call, it was decided to implement an alternative treatment plan that consisted of placing Plaintiff in the infirmary for monitoring of symptoms, performing a full neurological examination onsite, and obtaining Plaintiff's medical records prior incarceration. (Doc. 234-2, p. 7, 13, 16; Doc. 234-6, p. 110).

On April 29, 2018, Plaintiff had an appointment with Dr. Butalid for a follow-up and neurological examination. (Doc. 234-1, p. 29; Doc. 234-2, p. 6, 12; Doc. 234-6, p. 43). Plaintiff testified that he explained his symptoms and told Dr. Butalid that "it was painful." (Doc. 234-1, p. 29). Dr. Butalid testified he recorded the following regarding Plaintiff's neurological exam:

> "awake, alert, and oriented times three, pupils were qual and reactive to light, extraocular muscle intact, the tongue exam was in the midline, the muscle tone was good in both extremities, there was a good strong grip on both sides hands, no ataxia, deep tendon reflexes plus two on both sides at the knee, right and left upper back slight muscle tightness, no tenderness, no focal drooping of the muscles."

(Doc. 234-2, p. 12). Dr. Butalid further stated that he assessed Plaintiff's movements to be involuntary and that other than the involuntary movement, the neurological exam did not reveal any other abnormal findings. (*Id.* at p. 12-13). Dr. Butalid ordered admission into the infirmary for observation. (*Id.* at p. 6). Plaintiff's admittance to the infirmary was delayed, however, because he was transferred to Stateville for a federal civil trial in the Northern District of Illinois. Plaintiff was transferred to Stateville on May 2 and returned May 16. (Doc. 234-1, p. 31).

On June 7, 2018, Plaintiff saw Dr. Butalid for admission into the infirmary. (Doc. 234-1, p. 31; Doc. 234-6, p. 51, 53). Dr. Butalid examined Plaintiff and ordered various lab tests, including a complete blood count and tests for iron deficiency and thyroid function. (Doc. 234-2, p. 13).

While in the infirmary from June 7 until June 10, 2018, nurses charted their observations

of Plaintiff in his medical records. There is some disagreement between the parties regarding these medical records and what occurred in the infirmary. Although the medical records contain notations on Plaintiff's pain level, Plaintiff contends that the nurses never asked him if he was in pain during his time in the infirmary for observation. (Doc. 234-1, p. 33, 34; Doc. 251, p. 3).

On June 7, 2018, at 11:50 p.m. the nurse records, "no pain or discomfort voiced." (Doc. 234-6, p. 57). Plaintiff testified that he did not believe he "was in pain at that very moment." (Doc. 234-1, p. 33, 34). The nurse also recorded "no uncontrollable movement of any extremities noted at this time…no signs or symptoms of any cute discomfort." (Doc. 234-1, p. 34; Doc. 234-6, p. 57). Plaintiff testified that he did not disagree with that notation. (Doc. 234-1, p. 34).

On June 8, 2018, at 9:00 a.m., a nurse recorded "denies pain at this time, [no] abnormal body movements noted." (Doc. 234-6, p. 58). Plaintiff testified that he did not have a recollection of denying that he was in pain but stated "if I wasn't moving around at that time and pulling muscles, then I wouldn't have told her I was in pain." (Doc. 234-1, p. 34). As to no abnormal body movements being noted, Plaintiff testified that "if it wasn't happening, I was going to be honest with her." (Doc. 234-1, p. 34).

At 3:15 p.m. the nurse recorded "denies pain." (Doc. 234-6, p. 58). Plaintiff testified, "I'm not going to say that I wasn't in pain at that time. I don't know why they would put denies pain unless if I was laying down." (Doc. 234-1, p. 35). Plaintiff went on to say that he "had to be laying down 'cause that's all I could do in there." (*Id.*). When asked if it would be accurate that he denied pain on this visit because he was laying down, Plaintiff testified, "[y]es, it would be accurate." (*Id.*).

At 11:50 p.m., the nurse wrote "no complaints of pain or discomfort voiced." (Doc. 234-6, p. 59). As to this notation, Plaintiff testified, "[i]f I was laying down and I wasn't' in pain, I'm not going to voice pain." (Doc. 234-1, p. 35). The nurse also observed "no uncontrollable movements

Page 6 of 19

of upper trunk." (Doc. 324-6, p. 59). Plaintiff testified he would not dispute this notation "if I was laying down or sleeping." (Doc. 234-1, p. 35).

The next observation note was made on June 9, 2018, and 9:10 a.m. (Doc. 234-6, p. 60). The nurse records that Plaintiff stated, "I don't know what it is. It's getting worse," and that Plaintiff was sitting up in bed and shrugged his left shoulder often through the assessment. (*Id.*). She also records that Plaintiff gave a history of using psychotropic drugs as a child. (*Id.*). Plaintiff testified that this note was inaccurate. (Doc. 234-1, p. 35). It would have been his right shoulder that moved, and he did not take psychotropics as a child.

Another nurse came by Plaintiff's room at 5:00 p.m. The nurse records Plaintiff was sitting in a chair, and she observed twitching mainly in the right shoulder area. (Doc. 234-6, p. 61). It is not clear where Plaintiff was sitting during this encounter, as he testified that the room did not have any chairs. (Doc. 234-1, p. 36).

The next notation is at 11:40 p.m. later that same day. (Doc. 234-6, p. 61). The nurse writes "laying in bed. Easily roused from sleep…no twitching noted…" (*Id.*). Plaintiff testified that he did not dispute this entry. (Doc. 234-1, p. 36).

On June 10, 2018, a nurse recorded at 7:45 a.m. that Plaintiff was lying in bed and "no twitching seen at this time…patient voices no complaints." (Doc. 234-6, p. 62). Plaintiff testified that he did not disagree with this account but clarified "no complaints at that moment while I'm laying down and she didn't ask me if I was in pain." (Doc. 234-1, p. 36). Plaintiff was discharged from the infirmary later that day. (*Id.*).

On June 14, 2018, Dr. Butalid discussed Plaintiff in Collegial Review with Dr. Ritz, and again they declined to refer Plaintiff for a neurological evaluation at an outside facility. It is noted in the medical records that "patient's subjective complaints are not supported by the objective findings." (Doc. 234-6, p. 113). Plaintiff disputes this conclusion. (Doc. 251, p. 4). The doctors

agreed to an alternative treatment plan of continuing to monitor Plaintiff onsite and refer him to behavioral mental health. (Doc. 234-6, p. 67, 113; Doc. 234-2, p. 14-15). Dr. Ritz testified that when "we don't find concordance between a patient's complaints and the objective findings then this can sometimes be one of the hallmarks of a mental health or a behavioral diagnosis, which are very real diagnoses, but they have to be evaluated and managed in a very different way." (Doc. 234-5, p. 13).

On June 24, 2018, Plaintiff saw Christopher Smith, a licensed clinical social worker and qualified mental health professional. (Doc. 234-8, p. 34-35; Doc. 234-1, p. 50). Plaintiff reported that he was doing "good mentally, is not on any psych meds, and does not need any mental health services…" (*Id.*). Plaintiff testified that he asked Smith "why are they doing this to me?" and Smith responded by gesturing the "money sign," indicating the treatment decisions were about cost. (Doc. 234-1, p. 50; Doc. 251, p. 22). Smith discharged Plaintiff. Dr. Myers testified that if an inmate does not wish to engage in mental health services they can refuse. (Doc. 234-3, p. 23).

On June 26, 2018, Plaintiff saw Nurse Practitioner Alisa Dearmond requesting a low bunk/low gallery permit for involuntary tremors. (Doc. 234-6, p. 70). NP Dearmond spoke to Dr. Myers about the criteria for a low bunk/low gallery permit. According to NP Dearmond, in order to be issued a low bunk/low gallery permit a patient must (1) be 65 years or older; (2) have seizures; (3) have a prosthetic device; (4) must be morbidly obese; or (5) have had a recent surgery or injury. Plaintiff did not meet any of the criteria and so NP Dearmond denied Plaintiff's request. (Doc. 234-4, p. 7). Plaintiff disputes these criteria, arguing he previously received a low bunk/low gallery permit from Nurse Practitioner Blum, a permit when he was temporarily at Stateville on a court writ, and a permit at his current institution, Dixon Correctional Center, on May 7, 2021. (Doc. 234-1, p. 39; Doc. 251, p. 4; Doc. 251-1, p. 71). He also testified that NP Dearmond refused to give him pain medication. (Doc. 234-1, p. 39). Plaintiff testified that Dr. Myers was in the room during

this appointment. (*Id.*).

On July 1, 2018, Plaintiff had an appointment with Dr. Butalid. (Doc. 234-1, p. 40; Doc. 234-6, p. 73). Dr. Butalid testified that he examined Plaintiff and noted the following in the medical record:

> Seen by mental health, no mental issue, follow-up infirmary admission, he did not have involuntary movement when – in the infirmary, neurological referral was denied, but today he again complained of persistent twitching movement of both shoulders. He will bring records from Cook County and I will review."

(Doc. 234-2, p. 15). Plaintiff testified that he told Dr. Butalid that he had medical records from Cook County Jail that were relevant to his condition. (Doc. 234-1, p. 41). Dr. Butalid's plan was for Plaintiff to provide the medical records for review. (Doc. 234-2, p. 15). However, Dr. Myers became the medical director at Pinckneyville, and Dr. Butalid was reassigned to Menard Correctional Center. (*Id.*). The appointment on July 1, 2018, was the last time Dr. Butalid treated Plaintiff.

Plaintiff saw Dr. Myers on August 7, 2018. (Doc. 234-6, p. 76; Doc. 234-1, p. 41). Dr. Myers recorded that Plaintiff continued to have complaints of involuntary movement. (*Id.*). Plaintiff told Dr. Myers that he had hired a neurologist and was expecting a report. (Doc. 234-1, p. 41-42). Dr. Myer's plan was to review the report once provided by Plaintiff. (*Id.*). Around this same time, Dr. Myers reviewed a report of a consultation Plaintiff had with Dr. Theresa McCarthy, the physical medicine and rehabilitation specialist, which occurred on September 5, 2017, while Plaintiff was in Cook County Jail. (Doc. 234-1, p. 45; Doc. 234-7, p. 91-95).

Plaintiff saw Dr. Myers again on September 14, 2018, complaining of pain in his lower back. (Doc. 234-6, p. 81; Doc. 234-1, p. 43). Dr. Myers prescribed Motrin. (Doc. 234-8, p. 81). Dr. Myers recorded that "I have observed this inmate numerous times while he was in the infirmary and while walking in the yard and there were no body contortions/movements. Gait was normal."

(Doc. 234-6, p. 81; Doc. 234-1, p. 44). Plaintiff disputes that this observation is accurate. (Doc. 241, p. 19). He testified that he would not agree that Dr. Myers observed him numerous times. (Doc. 234-1, p. 44). Plaintiff stated that he could only remember seeing Dr. Myers "three or so" times. (*Id.*).

Plaintiff last saw Dr. Myers on October 12, 2018. (Doc. 234-1, p. 45; Doc. 234-6, p. 84). Dr. Myers recorded that he observed "no tremor," but that Plaintiff "continues to have constant movement." (Doc. 234-6, p. 84). Dr. Myers told Plaintiff to return to clinic when he had his neurologist's report. (*Id.*). On October 15, 2018, Plaintiff was transferred to Dixon Correctional Center. (Doc. 234-1, p. 45).

Since his transfer to Dixon, Plaintiff has had an MRI taken and was seen by a neurologist, Dr. Yasaman. (Doc. 251, p. 25-26). Dr. Yasaman recorded the results of the MRI as follows:

> Parenchymal volume loss with normal appearing basal ganglia structures…at this time is that clinical and radiographic findings are unrelated…the etiology of brain atrophy is unclear (Drug? Alcohol) but most likely unrelated to his current presentation.

(Doc. 251-1, p. 58). Dr. Yasaman further documented "[l]ow concern for organic etiology. Plan is referral for neuropsychiatric testing and psychiatric assessment, alongside cognitive behavioral therapy. No additional imaging or test planned at this time." (*Id.*).

Plaintiff has been seen by psychiatrist, Dr. Maitra. According to her notes, as of April 28, 2022, Plaintiff had not been prescribed any medication for his condition and was awaiting further follow-up with a neuropsychiatrist and an appointment with a movement disorder clinic. (Doc. 251, p. 27; Doc. 251-1, p. 98).

## LEGAL STANDARDS

### *I. Summary Judgment Standard*

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary

judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a three-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner

has an "objectively serious medical condition." *Id*. *Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of serious harm") (internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id*. at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims

>to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). Additionally, a medical professional's choice of an easier, less efficacious treatment can also rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441.

## ANALYSIS

Defendants first dispute whether Plaintiff suffered from an objectively serious medical condition. (Doc. 234, p. 19). They contend that there is insufficient evidence for the jury to conclude that at the time he was being treated by Defendants his condition was objectively sufficiently serious. (*Id.*). Plaintiff responds that he suffers from an undiagnosed involuntary movement disorder that causes him pain. (Doc. 241, p. 29). He states that an involuntary movement disorder is neurological in nature, which is a potentially objectively serious medical condition that can lead to objectively serious harm. (*Id.*).

Given the summary of the record, whether Plaintiff has a serious medical condition is a fact in dispute that cannot be determined at summary judgment. However, even if the Court assumes that Plaintiff's condition was objectively serious, there is insufficient evidence from which a reasonable jury could conclude that any Defendant acted with deliberate indifference.

### I. Dr. Myers, Dr. Butalid, Dr. Ritz, and NP Dearmond

Plaintiff's main argument is that the failure of Dr. Myers, Dr. Butalid, Dr. Ritz, and NP Dearmond to refer him to a specialist was outside of accepted standards for medical care and constituted deliberate indifference. (Doc. 241, p. 29-30; Doc. 251, p. 14). There is insufficient

evidence to support this claim. The Seventh Circuit has held:

> A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care. Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate.

*Pyles v. Fahim,* 771 F. 3d 403, 411 (7th Cir. 2014) (internal citations and quotations omitted). Here, there is nothing in the record demonstrating that Defendants' decision to not send Plaintiff for a consultation with a neurologist was "blatantly inappropriate."[2] In fact, Plaintiff's previous medical providers made similar treatment decisions. Prior to his transfer to Pinckneyville, Plaintiff was seen by Dr. McCarthy, who noted that she did not observe evidence of a twitch or spasm and recommended monitoring Plaintiff. (Doc. 234-7, p. 18). A month later in October 2017, Plaintiff was seen by Dr. Ennis, who recorded that "movements have not been witnessed while in clinical setting," and his treatment plan was also to "continue monitor for now." (Doc. 234-7, p. 40). The evidence viewed in a light most favorable to Plaintiff demonstrates that he wanted different care than what was being provided, not that Defendants' decision to treat him onsite was a substantial departure from accepted medical judgment.

In his supplemental response, Plaintiff also appears to argue that the decision by Dr. Butalid, Dr. Myers, and NP Dearmond not to refer him to a neurologist constituted deliberate indifference because Defendants were not in fact exercising professional judgment in reaching that determination. Rather, they essentially were following corporate orders, which would not allow

---

[2] The report of Plaintiff's expert, Dr. Kohn, will not be considered due to noncompliance with Federal Rule of Civil Procedure 26(a)(2)(B). (*See* Doc. 267). Even if the Court had considered the expert report, however, demonstrating a deviation from the standard of care is not sufficient for a constitutional claim. *See Murphy v. Wexford Health Sources, Inc.*, 962 F. 3d 911, 916-17 (7th Cir. 2020) (finding that an expert's opinion that the defendant deviated from the standard of care suggested negligence rather than deliberate indifference). To be liable under the Eighth Amendment, Defendants must choose a course of treatment that "departs radically from accepted professional practice." *Zaya*, 836 F. 3d at 805. Furthermore, evidence that some professionals would have chosen a different course of treatment is not sufficient to overcome summary judgment. *Petties,* 836 F. 3d at 729.

them to refer Plaintiff to a neurologist. (Doc. 251, p. 7, 10, 20-21).[3] Even if it is true that these Defendants were following direction from "corporate" or Dr. Ritz while treating Plaintiff, that fact alone is not sufficient for a jury to infer that doing so constituted a conscious disregard of a risk to Plaintiff's health or that the decision to observe him onsite was "so obviously wrong that a layperson could draw the required inference." *Whiting,* 839 F. 3d, at 662. "There is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field," and Plaintiff has not presented evidence that Defendants' treatment decisions were contrary to the prevailing standards of medicine. *Locket v. Bonson,* 8937 F. 3d 1016, 1023 (7th Cir. 2019) (citation omitted).

Finally, Plaintiff also contends that there exists an issue of fact regarding whether Defendants acted with deliberate indifference specifically in treating his pain. He asserts that they failed to prescribe him pain medication and did not include pain management in the alternative treatment plans. Plaintiff has described his pain as "severe" or "extreme" and "like, a charley horse type of pain" from pulling muscles in his neck and back from his movements. (Doc. 234-1, p. 31; Doc. 251, p. 18-28). He testified that the pain could vary from 6, 7, and 8 on a scale of ten, "could last a couple minutes here and there. Sometimes longer…," and was constant through the day but not "24 hours a day." (*Id.* at p. 31, 34). He further stated that he informed each Defendant at his appointments that his condition was "painful." (Doc. 234-1, p. 26-27, 29, 34). Plaintiff asserts that Dr. Myers told him on more than one occasion there was not anything he could do for Plaintiff's pain. (Doc. 234-1, p. 27, 39, 42). On September 14, 2018, Dr. Myer prescribed Plaintiff 400 mg tablets of Ibuprofen with the direction to take one tablet a day. (Doc. 234-8, p. 83). Plaintiff agrees

---

[3] Plaintiff points to testimony of Dr. Butalid and Dr. Myers stating that it was Dr. Ritz who made the decision to deny the neurology referral. (Doc. 251, p. 37; Doc. 234-3, p. 4, 9). Plaintiff also alleges that Dr. Butalid told him he was being referred to the infirmary at corporates direction because "its expensive and they want to prevent malingering," and that Dr. Butalid, Dr. Myers, and NP Dearmond told him his problem was neurological, and he needed to go to a neurologist. (Doc. 251, p. 20-21; Doc. 234-1, p. 38-40).

with Dr. Myer's decision to prescribe him Ibuprofen but asserts that the medicine was prescribed "several months late," or in the case of Dr. Butalid, NP Dearmond, and Dr. Ritz, the medicine was not prescribed at all. (Doc. 234-1, p. 44; Doc. 251, p. 15).

Even considering his statements, Plaintiff has failed to show that his pain amounted to an objectively serious medical need. While a "serious medical need" encompasses medical conditions less critical than life threatening, not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters,* 111 F. 3d 1364, 1373 (7th Cir. 1997). Here, Plaintiff's extreme and severe pain was effectively treated with over the counter 400 mg tablets of Ibuprofen. Prior to receiving this prescription, he was still able to walk, exercise, and attend yard. (Doc. 234-1, p. 44, 53). Despite spending over $4,000 at the commissary, Plaintiff only purchased 200 mg tablets of Ibuprofen on two occasions during his time at Pinckneyville. (Doc. 234-9). Plaintiff testified that he did not purchase more because the pain medicine at the commissary was not as strong as what was given in the health care unit, but he does not explain why he did not take two of the 200 mg tablets if he felt he needed 400 mg of medicine to relieve his pain. (Doc. 234-1, p. 31, 44). There is no evidence that his pain was diagnosed by a doctor as mandating treatment or requiring a pain management plan, nor could a lay person recognize the necessity for a doctor's attention for the type of pain effectively treated with over the counter pain killers. Thus, he has failed to establish that his pain was "objectively, sufficiently serious," and Defendants cannot be found deliberately indifferent for failing to prescribe him pain medicine or to implement pain management. *See Snipes v. DeTella,* 95 F. 3d 586, 591 (7th Cir. 1996) (pain experienced by removal of toenail not constitutionally serious); *Rowe v. Brown,* No. 11-cv-01110-TWP-DKL, 2014 WL 1883810, at *5 (S.D. Ind. May 9, 2014) (back pain from a pulled muscle is not a serious medical need); *Alvarez v. Lang,* No. 14-CV-1067-NJR-DGW, 2016 WL 5639465, at *3 (S.D. Ill. Sept. 26, 2016) (finding that the plaintiff's "muscle

strain/joint pain" was not a serious medical need, and granting defendant doctor's motion for summary judgment).

"When considering whether an inmate's medical care demonstrates deliberate indifference to his serious medical needs, [the Court] look[s] at the inmate's medical care as a whole and not only at incidents in isolation." *Reed v. Indiana Dep't of Corr.*, 30 F. App'x 616, 619 (7th Cir. 2002) (citations omitted). In light of the entirety of the record, there is nothing from which a jury could reasonably infer deliberate indifference on the part of Defendants in their treatment of Plaintiff from January 2018 through October 2018. During his nine months at Pinckneyville, Plaintiff had regular visits with healthcare providers concerning his involuntary movements and associated pain. After complaining of his symptoms, medical staff performed laboratory testing, issued prescriptions for medications and vitamins to treat abnormal findings in his blood work, conducted a neurological examination, placed Plaintiff in the infirmary for observation by nurses, and conducted physical examinations. Following his discharge from the infirmary, Dr. Ritz and Dr. Butalid concluded that Plaintiff did not require an outside neurological consultation because the objective findings did not support a diagnosis of a neurological disorder. (Doc. 234-2, p. 14). At that point, his doctors determined that the appropriate treatment was to continue to treat him at the facility rather than refer him to an outside specialist. (*See* Doc. 234-3, p. 24). Until his transfer, Plaintiff continued to be seen by medical staff and was prescribed Motrin for his pain. While Defendants made treatment decisions that Plaintiff did not like, such as not renewing his low bunk/low gallery permit and not referring him to a specialist, Plaintiff has not presented any evidence to support his assertion that Defendants acted with reckless disregard for his health. Accordingly, summary judgment is granted as to Defendants Dr. Myers, Dr. Butalid, Dr. Ritz, and NP Dearmond.

*II. Wexford Health Sources, Inc.*

In the Complaint, Plaintiff claims that Wexford maintained a cost-cutting policy aimed at denying inmates access to expensive treatment that resulted in the delay or denial of referrals to specialists outside the prison. (*See* Doc. 4, p. 4). When it comes to a municipal government or a corporate entity like Wexford, they cannot be held liable on a simple supervisory liability. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). Instead, Plaintiff must show that the violation of his constitutional rights was caused by "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.,* 987 F.3d 647, 653 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978); *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017)).

In the motion for summary judgment, Defendant Wexford argues that if there is no underlying constitutional violation, then Wexford cannot be held liable. (Doc. 234, p. 25). Wexford contends that Plaintiff has failed to show that medical providers have acted with deliberate indifference, and even if a provider was deliberately indifferent, there is no evidence that a Wexford policy motivated such conduct.

Plaintiff has not responded to Wexford's arguments. In his deposition, Plaintiff stated that he believes that cost was a factor in his treatment decisions based on comments made to him by a nurse, Mental Health Professional Christopher Smith, and Dr. Butalid. (Doc. 234-1, p. 50; Doc. 251, p. 20, 22). He also testified that he spoke to many inmates who were denied specialist referrals and read a professional service agreement. (Doc. 234-1, p. 51). Plaintiff stated that this document coupled with his experience and the experiences of other inmates led him to believe cost was a factor in his treatment and the decision not to send him out to a neurologist. (*Id.*).

Plaintiff's testimony and affidavit are not sufficient to create a genuine issue of fact concerning Wexford's alleged policy. He has not provided or cited to a specific expressed policy or provided evidence, such affidavits from other inmates, concerning a widespread practice. "To prove an official policy, custom, or practice within the meaning of *Monell*," a plaintiff "must show more than the deficiencies specific to his own experience, of course." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Furthermore, because the Court has determined that the Defendant medical providers exercised acceptable professional judgment in deciding whether to refer Plaintiff to a specialist, Wexford cannot be liable for the denial. *See Laws v. Wexford Health Sources, Inc.,* 721 F. App'x 544, 546 (7th Cir. 2018). Therefore, the motion for summary judgment is granted as to Wexford.

## DISPOSITION

For the reasons stated above, the Court **GRANTS** the Motion for Summary Judgment filed by Defendants Ritz, Butalid, Myers, Dearmond, and Wexford Health Sources, Inc. (Doc. 233).

This case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and to close this case.

**IT IS SO ORDERED.**

**DATED: March 20, 2023**

      *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**